**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| HOMER A. MADDIN, III, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 3:09-00259 |
| | ) | Judge Haynes |
| v. | ) | |
| | ) | |
| RICKY J. BELL, Warden, | ) | |

**M E M O R A N D U M**

Petitioner, Homer A. Maddin, III, filed this pro se  action under 28 U.S.C. § 2254 seeking

the writ of habeas corpus to set aside his state convictions for four aggravated rapes for which he

received a sentence of twenty-five (25) years.  After a review of the pro se action, the Court

appointed the Federal Public Defender to represent Petitioner and an amended petition[1] was

filed.  (Docket Entry No. 14).  In his amended petition, Petitioner's claims are, in sum: (1) denial

of effective assistance of trial counsel for his counsel's failures: to conduct an adequate pretrial

investigation, to communicate with petitioner prior to trial, to raise alternative defenses, to object

to prosecutor's comments, to object to DNA evidence, to object to the jury instruction on

recklessness and to prepare for sentencing; (2) denial of effective assistance of appellate counsel

who failed to raise claims of the ineffectiveness of trial counsel on direct appeal; (3) the trial

court unconstitutionally enhanced  his sentence; (4) the state prosecutor violated  Brady v.

---

[1] The amended petition incorporates the pro se petition without any legal analysis.  The Federal
Rules of Civil Procedure can apply to a habeas action.  Mayle v. Felix, 545 U.S. 644, 649
(2005); Rule 6(a), Rules Governing Section 2254 Cases.  Under Fed. R. Civ. P. 15 (a), the filing
of an amended complaint supersedes the prior complaint.  Clark v. Tarrant County, 798 F.2d
736, 740-41 (5th Cir. 1986).  Thus, the Court deems the amended petition to supersede the pro se
petition and the claims therein.  Unless adopted and supported by legal memorandum, the Court
deems those pro se claims to be waived.

<u>Maryland</u>, 373 U.S. 83 (1963) by withholding physical evidence; and (5) that the trial court gave erroneous jury instructions.

## A. Procedural History

After a jury trial, Petitioner was convicted of four counts of aggravated rape and was sentenced to twenty-five (25) years on each count, to be served concurrently, at one-hundred percent (100%). (Docket Entry No. 15-1, at 22-25). The trial court also denied Petitioner's motion for a new trial. <u>Id.</u> at 45-49. On direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's convictions and sentence. <u>State v.Maddin,</u> 192 S.W.3d 558 ( Tenn. Crim App. 2005). The Tennessee Supreme Court denied Petitioner's application for permission to appeal. <u>Id.</u>

Petitioner then filed a <u>pro se</u> petition for post-conviction relief and after appointment of counsel and an evidentiary hearing, the trial court denied the petition. (Docket Entry No. 15-12, at 51-58. On appeal, the Tennessee Court of Criminal Appeals affirmed. <u>Homer Alson Maddin, III v. State of Tennessee,</u> M2007-02708-CCA-R3-PC, 2008 WL 4735497 (Tenn. Crim. App. Oct. 27, 2008). The Tennessee Supreme Court denied Petitioner's application for permission to appeal. <u>Id.</u>

## B. Review of the State Record

In Petitioner's direct appeal, the Tennessee Court of Criminal Appeals made the following findings of facts[2] underlying Petitioner's convictions:

> The victim testified that she was nineteen years old at the time that the crime took place. She admitted that she had known the appellant since the eighth grade and that the two dated briefly at that time. Two days prior to the crime, the appellant telephoned the victim to give her his new telephone number.

---

[2]State appellate court opinion findings can constitute factual findings under 28 U.S.C. § 2254(d) with a statutory presumption of correctness. <u>Sumner v. Mata</u>, 449 U.S. 539, 546-47 (1981).

According to the victim, on July 12, 2002, she and her boyfriend, Mike Forbes, ran errands and then returned to his apartment to hang out with some friends. At some point, the victim took several Xanax. Eventually, the victim was hanging out with Brittany Bayless, drinking wine coolers and "trying to have a good time." Ms. Bayless was upset about her recent break-up with her boyfriend. The victim decided that she would call the appellant in an attempt to get some more pills for her friend to help her calm down. The appellant agreed that he would get the pills and instructed the victim and Ms. Bayless to meet him at a local cinema. When they met, the appellant told the women to follow him in their car to his father's house where he would make some telephone calls in an effort to find some pills.

At the appellant's father's house, there were numerous people and a "lotta heavy drinking going on" at what appeared to be a "big party." The appellant and his father's girlfriend made several phone calls, trying to locate pills. Having no success, the victim, the appellant, and Ms. Bayless left the party and went to the home of the appellant's friend. The appellant asked the victim to give him a ride to go buy some marijuana. The victim did not want marijuana, so she took the appellant back to his father's residence. At some point, the appellant asked the victim to take him to his mother's house. The victim agreed. When they arrived, the appellant asked the victim to come inside for a minute. Ms. Bayless remained in the car.

According to the victim, once they entered the apartment, the appellant had a brief argument with his mother, then ushered the victim into a bedroom and left her alone. When the appellant returned to the bedroom, he "closed the door and got extremely close," trying to kiss her and asking her to have sex with him. The victim testified that she refused and reminded the appellant that she had a boyfriend. The victim claimed that she tried to leave, and the appellant threw her on the bed, put a knife to her throat and told her "not [to] make any noises" because she did not "wanna get hurt."

The victim explained that the appellant then removed her shorts, "used his tongue" on her "private area" then forced her to "have sex with him." The victim testified that she was "silently crying the whole time" and begged him to leave. When the appellant was finished, the victim put back on her shorts and got ready to leave. The appellant then forced the victim to perform oral sex on him. After complying for a few seconds, the appellant then penetrated the victim's vagina with his fingers and forced her to "have sex with him again." The victim testified that the appellant ejaculated on both occasions and that the appellant had a knife in his hand the entire time.

The appellant's version of the facts differed significantly from that offered by the victim. The appellant maintained that the victim telephoned him looking for pills. The appellant proposed that they meet at a local cinema so that the victim could follow him to his father's house. The victim and Ms. Bayless met the appellant and followed him to his father's house. Once at the house, the appellant made several phone calls, trying to locate some pills for the victim. According to the appellant, the victim offered him sex in exchange for pills. The three then left the party to go to the home of the appellant's uncle

to try to find drugs. Having no success, the three went to another location, again attempting to find pills or marijuana.

The appellant testified that during the time the three (3) were searching for drugs, the victim was "hugging" on the appellant and repeatedly offered to have sex with him if he could get her some pills. After visiting several locations trying to find pills, the three (3) returned to the appellant's father's house to make more phone calls. The appellant claims that, at that time, the victim asked his father for pills and also offered him sex in exchange for drugs. In response to the actions of the victim, the appellant testified that his niece, Julie Maddin, got into an argument with the victim and pushed her down, causing the victim to bleed from the neck and elbow.

After the altercation, the appellant stated that he asked the victim to take him back to his mother's apartment. When they arrived, the appellant claimed that the victim came into the house with him and again offered to sleep with him if he could get her some pills. According to the appellant, the victim began "rubbing" on his leg and then "worked her way down" and "started rubbing" on his penis. The appellant claimed that the victim unbuckled his pants, rubbed his penis and took off her clothes. The appellant claimed that the victim was not only a willing participant, but also the aggressor during the encounter. The appellant admitted that he and the victim had sex and that he ejaculated on the bed, then the victim asked him to roll over so that she could "get on top." At that point, the appellant stated that he and the victim had sex for a second time and he ejaculated again on the bed. The appellant claimed that the victim wanted to have sex for a third time, but the appellant told her she could give him a "blow job." According to the appellant, the victim willingly complied.

The appellant denied that there were any knives in the room. He stated that when he and the victim left the apartment, they were holding hands.

At the conclusion of the jury trial, the jury convicted the appellant of all four counts of aggravated rape.

Maddin, 192 S.W.3d at 559-61. The state appellate court's other factual findings are set forth in the context of Plaintiff's specific claims.

## C. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412.

In Greene v. Fisher, _U.S._, _S. Ct._, 2011 WL 5335411, at *2 (Nov. 8, 2011), the Supreme Court considered whether "'clearly established Federal law' includes decisions of this Court that are announced after the last adjudications of the merits in state court but before the defendant's conviction becomes final" and answered the question in the affirmative. There, a Supreme Court decision at issue was rendered two months after the state supreme court upheld the petitioner's convictions. The Supreme Court held that its decision was not clearly established at the time of the state supreme court's decision. Id. at *3-5. The Supreme Court noted a different result if the Petitioner had applied for the writ of certiorari or had filed a state postconviction petition. Id. at *5.

In Bell v. Cone, 535 U.S. 685, 693 (2002), the Supreme Court reiterated that the AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent

possible under the law." Under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

In reaching this decision, the Supreme Court reiterated that the claims were to be decided on the record before the state court:

> In this and related contexts we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it. See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason,

325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes

credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

### 1. Ineffective Assistance of Counsel Claim

In his post-conviction appeal, Petitioner's ineffective assistance of counsel claims were

as follows:

> In this case, Appellant did not receive effective assistance of counsel because trial
> counsel failed to communicate with or adequately prepare the Appellant for trial
> ... failed to explain the potential punishment involved in the case, and failed to
> communicate to the Appellant a plea bargain offer from the State ... failed to
> properly investigate the case ... failed to effectively cross-examine the State's
> witnesses ... failed . . . to impeach the credibility of the victim ... fail[ed] to object
> to the statements by the District Attorney General during her rebuttal closing
> argument ... failed to object to the authenticity and chain of custody of a knife that
> was introduced at trial . . . . [and] failed to raise on appeal trial counsel's failure to
> advise and prepare Appellant for the sentencing hearing.

(Docket Entry No. 15-11, Post-Conviction Brief, at 209-213).

On appeal, the Tennessee appellate court referenced the state trial court's findings on

these claims:

> At the hearing, petitioner testified he met with his attorney on four occasions
> while incarcerated prior to trial and then, after being released bond, he met with
> him for one hour immediately preceding the trial. The Petitioner stated he told
> his attorney about phone calls made from his mother's house prior to the alleged
> incident, but his attorney did not attempt to recover those phone records. Further,
> he believes his attorney did not explain all the elements of the crimes. He stated
> he thought he had to testify and did not know he had the right not to testify at the
> trial. He stated he did not want to testify at his trial. He also alleged his attorney
> never brought him any plea offers and would have taken an offer if he had known
> the potential punishment he was facing. He felt his attorney should have
> investigated he father's house where an altercation between the victim and his
> niece is alleged to have occurred a year prior to the indictment and the retaining
> of his trial counsel. He stated the victim used a washcloth following that fight
> which would have had her blood on it and would have proven that she received
> her injuries from a fight instead of from the for the offenses for which he was
> charged.

\* \* \*

TBI agent Hunter Green testified there was no blood found on the knife, rather the DNA from the victim found on the knife came from a non-blood source.

Patrick Johnson, trial counsel for the petitioner, testified he has been practicing since 1980. He believed he met with the petitioner at the jail four to six times. He stated petitioner's father was highly involved in the petitioner's case. He felt he could work well with petitioner's father because he was in touch with the other family members and potential witnesses of the case. He stated he met with the petitioner on at least two occasions after the petitioner was released on bond. Trial counsel was aware of petitioner's learning disability and did discuss the evidence in the case with him. He also discussed the DNA evidence with the petitioner and his father and discussed the elements of the case with petitioner. He stated he had to change the defense strategy when the petitioner insisted no knife was present, but the victim's DNA was recovered from the knife. He stated the petitioner maintained he was not guilty of the crimes, therefore he felt the only successful defense would necessitate the petitioner testifying. He did not recall specifically discussing the petitioner's right not to testify because the defense strategy always involving him testifying and without his testimony there could be no defense to the issue of consent. He stated he did inform the petitioner of a twenty-year plea offer, but that the petitioner was adamant that he had not done anything wrong. He acknowledged that the sheriff's department records showed him visiting with the petitioner on three occasions, but believes he met with him more, including on his court appearance dates.

* * *

In this case, the Court accredits the testimony of trial Counsel and finds he did adequately meet with and prepare the defense in this case. Trial counsel testified he met with the petitioner on several occasions and had extensive contact with the petitioner's family and witnesses in the case. The Court finds the petitioner failed to prove this issue by clear and convincing evidence, therefore it is dismissed.

Next, the Court again accredits the testimony of trial counsel and finds he did present the petitioner with a plea offer. The Court discredits the testimony of petitioner that he would have taken a twenty year sentence to serve at 100%, yet still profess his innocence, and finds he failed to prove this issue by clear and convincing evidence. . . .

Petitioner alleged trial counsel did not secure certain phone call records, did not attempt to locate a washcloth from a year prior to his arrest, and did not present necessary witnesses. The Court accredits the testimony of trial counsel that he did investigate the case, particularly through the petitioner's father and family. He stated he met with witnesses and was assured they

would attend the trial. As for the washcloth, the Court finds the petitioner could not show that the alleged washcloth would have been available a year after its use nor that even if it were obtained, it would have aided his defense. Whether the phone calls were made or not, would not have negated the victim's testimony and no proof was offered as to who the recipient was or what their testimony would have been. . . .

The Petitioner alleges trial counsel did not act effectively during the trial in his cross-examination of witnesses or presentation of evidence and failed to present credible alternative theories in defense of the State's case. The Court will not second guess the trial strategies of counsel. He testified he presented the case based upon the petitioner's persistence that he was innocent and that the sexual acts were consensual. The Court finds the petitioner has failed to prove this allegation by clear and convincing evidence and the issue is dismissed.

The petitioner presented proof that the victim had been arrested immediately prior to the trial on forgery charges, however the petitioner acknowledged she was not convicted of those charges. The Court finds trial counsel effectively cross examined the victim in this case. The jury heard evidence from the victim and of the victim's alleged bad character on the evening of the incident through other witnesses and chose to accredit her testimony. The Court finds the petitioner has failed to prove this allegation by clear and convincing evidence and it is therefore dismissed. . . .

At the hearing, the petitioner testified he wanted his attorney to present the testimony of David Decker, who would have testified the victim was making sexual advances to him the night of the crime. . . . At the trial, the petitioner's father testified to the same events that Mr. Decker would have testified. This issue is dismissed. . . .

The Court finds the petitioner did not present proof of any problem with the chain of custody regarding the knife. . . . **Even if those issues had been proven, the evidence would not have disproved the allegations of rape in this case and therefore the petitioner was not prejudiced by the substance of those allegations**. As to the argument regarding whether trial counsel did not give the petitioner the choice as to whether to testify, the Court always gives defendants the choice between testifying and not testifying. The Court accredits the testimony of trial counsel that he met with the petitioner and discussed with the petitioner the issue of testifying and what the petitioner's testimony would be. . . .

(Docket Entry No. 15-12, Technical Record, Order at 52, 53, 55, 56, 57, and 58) (emphasis

added).

In the post-conviction appeal, the Tennessee appellate court made other factual findings on these claims:

> In the post-conviction evidentiary hearing, the petitioner testified that he was a "slow learner" and had failed to earn a "GED" after four years of schooling at "River Bend." He testified that trial counsel visited him three or four times prior to trial and that, on those occasions, he told counsel that the victim's injuries and her bleeding resulted from a fight with the petitioner's niece and that a washcloth bearing the victim's bloodstains would have established the origin of the injuries and blood. The petitioner testified that when he arrived at his mother's house on the evening of the crimes, he made a number of telephone calls to "buddies."
>
> The petitioner testified that counsel never explained the elements of aggravated rape and never told him that he had the option not to testify at trial. He testified that he "didn't want to testify" at trial because, he said, "I ain't educated well enough." Nevertheless, he believed that he was compelled to testify. The petitioner denied that counsel informed him about the potential punishment he faced or that he could receive consecutive sentences. He testified that he "never heard [about] a plea." He testified that, had he known that he could receive consecutive 25-year sentences, he would have "took the fifteen." The petitioner testified that, to his knowledge, counsel did not visit the scene of the crimes.
>
> The petitioner testified that he told counsel that he wanted his stepbrother, David Deckard, to testify at trial. He stated that he was unaware that a sentencing hearing would be held following the guilty verdicts and that counsel did not discuss with him any strategy for the sentencing hearing. He testified that he gave an uncounseled interview to the presentence investigator.
>
> The petitioner denied that counsel told him that a sample of the victim's DNA had been found on a knife.
>
> On cross-examination, the petitioner admitted that he was not charged with the offenses against the victim until a year after the events and that trial counsel was not engaged until that time. He admitted that he did not know what became of the washcloth. The petitioner claimed that independent proof of the telephone calls he made would have established that the victim was looking for drugs. He further admitted that David Deckard's proposed testimony would have duplicated other evidence heard by the jury. The petitioner testified that he would have taken a plea offer of twenty years to serve at 100 percent.
>
> Metropolitan Nashville (Metro) police officer Warren Fleak testified in the evidentiary hearing that he investigated the crime scene and collected evidence including bed sheets, a bedspread, pillows, clothing, and two knives. He testified that the items were not used as evidence at trial and that the police department had destroyed them.

Metro detective Kent McAlister testified that he found no blood when he investigated the crime scene. The detective recalled that the petitioner's counsel requested that the knives be tested for the presence of biological material. He testified that the test revealed merely the presence of a substance of human origin.

Tennessee Bureau of Investigation forensic scientist Hunter Green testified that she tested the knives in question. She found no blood but found some other biological material of human origin.

The petitioner's trial counsel testified in the evidentiary hearing that he had been practicing law since 1980. He met with the petitioner at the jail four to six times and met with him twice after he was released on bond. Counsel testified that he was hired by the petitioner's father and worked with the father and other family members "in gathering evidence." Counsel testified that he was aware of the petitioner's learning disability and intelligence quotient score of 75. He testified that he told the petitioner what the prospective witnesses including David Deckard would say at trial. He told the petitioner about the test results on the knife.

Counsel testified that the petitioner's initial posture in the case was that he was not guilty and that no knife had been at the scene. Counsel testified that the discovery of the biological material on one of the knives damaged the defense's strategy of consensual sexual activity. Counsel could not recall whether he talked to the petitioner about his right not to testify, but he opined that the only way to advance the petitioner's defense in a "he said, she said" scenario was for him to testify. Otherwise, "the jury would not have heard his version of the events." Counsel testified that, "from day one," he and the petitioner operated from the assumption that the petitioner would testify as a means of advancing his theory of defense.

Counsel testified that he conveyed to the petitioner the State's 20-year plea offer; however, the petitioner was "pretty adamant" that he was not guilty.

Counsel agreed that he did not visit the crime scene but stated he saw no reason to do so because he had been engaged to represent the petitioner "long after the event." He testified that at trial he used a diagram of the apartment where the offense occurred.

Counsel testified that he did not subpoena David Deckard because, prior to trial, he met with Mr. Deckard and the petitioner's other family members who could serve as witnesses, all of whom agreed to be present at trial without the behest of a subpoena. When it developed that Mr. Deckard was unavailable for trial, counsel elected to proceed because the petitioner's father could provide the same information as could have been related by Mr. Deckard.

Counsel further testified that he met with the petitioner at least once prior to the sentencing hearing and obtained the petitioner's signature on a release for his mental health records.

Following the hearing, the post-conviction court entered extensive written findings of fact and conclusions of law. It accredited trial counsel's testimony over that of the petitioner and held that counsel had adequately met with the petitioner prior to trial, communicated the State's plea offer to the petitioner, properly investigated the case and prepared it for trial, and effectively cross-examined prosecution witnesses. The court determined that the petitioner failed to establish any deficiency in counsel's performance by failing to obtain the washcloth and/or the records of the petitioner's telephone calls on the night of the offenses. The court held that trial counsel did not trammel the petitioner's right to not testify at trial; the court stated that, as the trial court in the petitioner's case, it "always gives defendants the choice between testifying and not testifying." The court further held that the petitioner was not prejudiced by counsel's failure to further impeach the victim, by failing to call Mr. Deckard to testify, by failing to present-or otherwise object to-certain tangible evidence, and by failing to object to the prosecutor's final argument. Specifically, the court determined that the jury heard evidence of the victim's bad character and nevertheless accredited her testimony. Also, the court found that the proposed testimony of Mr. Deckard would have been cumulative to that of the petitioner's father. The post-conviction court determined that any liberties taken by the prosecutor during final argument were cured by the trial court's instructions. The post-conviction court also held that the petitioner had failed to establish the ineffective assistance of appellate counsel. Based upon its findings and holdings, the post-conviction court denied relief.

Maddin, 2008 WL 4735497 at * 2-4.

In Petitioner's post-conviction appeal, the Tennessee Court of Criminal Appeals rejected

Petitioner's claims reasoning as follows:

In the present case, nothing in the record countervails the post-conviction court's findings, and we affirm the denial of post-conviction relief. **The petitioner's complaints about counsel's lack of communication and preparation were expressed only by him and were contradicted by counsel, whose testimony the post-conviction court accredited. The petitioner simply failed to establish other claims by clear and convincing evidence. For instance, the petitioner failed to show that he was prejudiced by the alleged inadequate chain of custody of the knife used by the State as evidence. Also, the petitioner failed to demonstrate prejudice from counsel's failure to advise him of his right not to testify at trial, especially in light of the post-conviction court's finding that, at trial, the court advised the petitioner of his options with respect to testifying. Also, the petitioner failed to establish ineffective assistance as a**

result of counsel's failing to obtain the washcloth, the call records for his parents' residential telephones, and/or further testing of the knife and of other materials from the crime scene. The petitioner's evidence did not belie the post-conviction court's determinations that trial counsel adequately cross-examined State witnesses and competently sought to impeach the victim.

In this vein, the petitioner failed to establish ineffective assistance as a result of counsel's failure to discover that the victim had been arrested for forgery and had confessed to that crime shortly before the petitioner's trial. The petitioner failed to show that counsel's failure to discover the arrest for-or the confession to-forgery was deficient performance or that the arrest itself provided a basis for impeachment.

Furthermore, the record does not show that the petitioner was prejudiced by his counsel's failure to object to the prosecutor's closing argument, especially in view of the post-conviction court's determination that its jury instructions adequately attenuated any liberties the prosecutor may have taken.

The petitioner complains about his appellate counsel related to that counsel's failure to raise on appeal the issue of trial counsel's lapses in preparing the petitioner for the sentencing hearing. **We cannot sanction as ineffective assistance appellate counsel's failure to raise on direct appeal the issue of trial counsel's ineffectiveness during the sentencing proceedings. This court has repeatedly said that "[r]aising the issue of ineffective assistance of counsel on direct appeal is 'a practice fraught with peril.'"** See, e.g., State v. Mosley, 200 S.W.3d 624, 629 (Tenn. Crim. App.2005) (quoting State v. Sluder, No. 1236, slip op. at 16 (Tenn. Crim. App., Knoxville, Mar. 14, 1990)). **Even if the issue of trial counsel's performance in the sentencing proceedings had been raised as an issue of ineffective assistance in this post-conviction proceeding, we would fail to see that either deficient performance or prejudice was shown by a preponderance of the evidence.**

All in all, the record supports the post-conviction court's findings and conclusions of law, and for that reason, we affirm that court's denial of post-conviction relief.

Id. at *6-7 (emphasis added).

To establish ineffective assistance of counsel, Petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 695 (1984). As the Supreme Court has explained:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decision, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 690-91.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691. Counsel's failure "to conduct constitutionally adequate pretrial investigation into potential evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005). A court must examine not only to the individual errors of counsel, but must also view the effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, No. 98-1616, 2000 WL 712376, at *3 (6th Cir. May 23, 2000).

To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Williams, 529 U.S. at 390-91. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694.

As to Petitioner's claims that trial counsel failed to investigate, the state trial court found that Petitioner's counsel met with him six times, four at the jail and two after his release. In addition, Petitioner's counsel discussed with members of Petitioner's family collection of proof, including a discussion with Petitioner and his father of the victim's DNA on Petitioner's knife.

As to failing to discuss Petitioner's right to testify, the state court's factual finding reflect that Petitioner insisted that he was innocent and the initial defense strategy was that the sexual encounter was consensual. These decisions inherently reflect discussions between Petitioner and his counsel about testifying. Moreover, the state trial court advised Petitioner "of his options with respect to testifying." Maddin, 2008 WL 4735407 at * 6.

As to Petitioner's counsel's cross-examination of State's witnesses on their credibility, the state court found that Petitioner's counsel cross-examined the victim on her illegal drug activity at the time at issue. The trial record reflects that Petitioner's trial counsel elicited that the victim had taken drugs prior to the rapes and that omissions existed between her trial testimony and her written statements to the police officers. At trial, Petitioner admitted to the sexual conduct, but insisted the victim consented.

The significant issue here is that prior to trial, the victim allegedly confessed to forgery and defense counsel did not investigate and examine the victim on ths admission so as to challenge her credibility. The only proof on this issue is a police report referring to the victim's written admission to forgery. The victim's purported written admission is not in this record. There is not any evidence that the victim was convicted of forgery. At the time of Petitioner's trial, the victim's cited forgery charge was only a charge that in all likelihood, would not have been admissible. In any event, with the State's expert testimony that the victim's DNA was on Petitioner's knife (Docket Entry No. 15-6 at 133), the Court deems this omission of trial counsel was not prejudicial, as required by Strickland.

Petitioner cites several circuit decisions on Petitioner's counsel's failure to cross-examine the victim about the forgery charge. Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001) (finding ineffective assistance of counsel where, among other things, counsel's "failure to

investigate prevented an effective challenge to the credibility of the prosecution's only eyewitness"); Berryman v. Morton, 100 F.3d 1089, 1099 (3d Cir. 1996) (finding deficient performance where counsel failed to raise the victim's prior inconsistent identification testimony, given that "[t]he reliability of this victim's uncorroborated identification of [the defendant] cut[ ] directly to the heart of the only evidence against [the defendant]"); Tomlin v. Myers, 30 F.3d 1235, 1238 (9th Cir. 1994) (finding deficient performance where counsel failed to challenge an eyewitness's in-court identification in a case that "hinge[d] on an eyewitness's testimony"); Nixon v. Newsome, 888 F.2d 112, 115 (11th Cir.1989) (finding deficient performance where counsel failed to confront the prosecution's star witness with inconsistent statements, thus "sacrific[ing] an opportunity to weaken the star witness's inculpatory testimony"); Blackburn v. Foltz, 828 F.2d 1177, 1183 (6th Cir. 1987) (finding deficient performance where counsel failed to impeach an eyewitness with previous inconsistent identification testimony when "weakening [the witness's] testimony was the only plausible hope [the defendant] had for acquittal").

Yet, the Court deems these decisions distinguishable in that evidence of the victim's DNA on Petitioner's knife is a material factual difference that precludes a finding of actual prejudice required by Strickland.

## 2. Illegal Sentencing Claims

Petitioner's next claim is that the state trial court enhanced the sentence with facts not found by the jury and thereby violated his Sixth and Fourteenth Amendments under Blakely v. Washington, 542 U.S. 296 (2004). For Petitioner's convictions, applicable sentencing range was 15 to 25 year range. The trial court cited three relevant enhancement factors, specifically the "potential for bodily injury was great," Petitioner's criminal history of drug convictions and

Petitioner's status as a parolee at the time of the offense. As to Petitioner's criminal history, in sentencing, the state trial court stated the Petitioner's criminal history.

> Now, in terms of the enhancing or mitigating factors as they pertain to this particular case... I do think there are several factors that apply in terms of enhancing factors. Mr. Maddin, there's no question, does not have an extensive criminal record, but does have...I mean, he's...at the time of this report, he's twenty-one years of age. So, he hasn't had but three years to have an adult record, but, does have enhancing factors of prior - prior history of criminal convictions and criminal behavior. The criminal behavior is the extensive drug usage that he talks about some here today and, obviously, this event surrounded the attempt to obtain drugs. And, he acknowledges in his pre-sentence report, according to him, that he typically drinks a case of beer a day on weekends, used marijuana daily, and on weekends, would have two- two or three Xanax, Lortabs, Somas...and ... at eighteen tried Ecstasy...and says that he accidentally used cocaine while smoking marijuana. So, that extensive drug usage, obviously is a problem that's led - led him where he is today. But, he also has those misdemeanors that we've already been talking about as criminal convictions, which also involved drug activity and possession, drug paraphernalia and burglary tools.

> ... that potential for bodily injury was great. In fact, she did have bodily injury, albeit, scrapes, scratches, puncture wounds, whatever you want to classify them. She actually was injured and had she fought more extensively or done other acts rather than those Mr. Maddin performed upon her, may have resulted in further or more bodily injury.

(Docket Entry No. 15-2, at 49-50).

At his sentencing hearing, Petitioner admitted to facts that were the basis for the trial court's enhancement of his sentence:

THE COURT: Okay. Well, you were put on probation for drug related offense and a possession of burglary tools. Do you remember that?

MR. MADDIN: Yes, sir.

THE COURT: And, do you remember not reporting?

MR. MADDIN: Uh- yes, sir. . . .

* * *

THE COURT: Your dad testified at the bond hearing that you were on probation for a

drug offense. Would you agree with that?

MR. MADDIN: Yes, sir. I was on probation for drugs.

Id. at 34, 36-37.

On direct appeal, the Tennessee appellate court addressed this sentencing claim as

follows:

> [D]espite the ability of trial judges to set sentences above the presumptive
> sentence based on the finding of enhancement factors neither found by a jury nor
> admitted by a defendant, Tennessee's sentencing structure does not violate the
> Sixth Amendment and does not conflict with the holdings of Blakely
> v.Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), United
> States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), or United
> States v. FanFan, the case consolidated with Booker, because "[t]he Reform Act
> [of Tennessee] authorizes a discretionary, non-mandatory sentencing procedure
> and requires trial judges to consider the principles of sentencing and to engage in
> a qualitative analysis of enhancement and mitigating factors ... all of which serve
> to guide trial judges in exercising their discretion to select an appropriate sentence
> within the range set by the Legislature." Gomez, 163 S.W.3d at 661. As a result
> of the decision in Gomez, the appellant's issue is without merit.

Maddin, 192 S.W.3d at 563.

In the post-conviction appeal, the Tennessee appellate court recognized the Tennessee

Supreme Court's subsequent decision in State v. Gomez, 239 S.W.3d 733 (Tenn. 2007) (Gomez

II) that held that sentences enhanced by judge-found facts violate the Sixth Amendment. Id. at

740 ("That is, to the extent the Reform Act permitted enhancement based on judicially

determined facts other than the fact of a prior conviction, it violated the Sixth Amendment as

interpreted by the Supreme Court in Apprendi, Blakely, and Cunningham."). Yet, Respondent

argues that Blakely is not to be applied retroactively to cases on collateral appeal. See Schriro v.

Summerlin, 542 U.S. 348 (2004).

Here, Petitioner was convicted on February 26, 2004, and was sentenced on April 30, 2004. Blakely was decided on June 24, 2004 and applies to all cases on "direct review." Schring v. Summerlin, 542 U.S. 348, 358 (2004). Moreover, under Greene, the State courts did not complete "direct review" of Petitioner's sentence until March 27, 2006 when the Tennessee Supreme Court denied Mr. Maddin's Rule 11 application. Maddin, 192 S.W.3d at 558. To be sure, the Tennessee appellate court applied Gomez I, but the Tennessee Supreme Court overruled Gomez I in 2007. Gomez, 239 S.W.3d at 740. In the Court's view, Schring and Greene apply to render this federal sentencing claim actionable for habeas relief purposes. The state trial court undisputedly enhanced Petitioner's presumptive sentence under Tennessee law on facts that were not found by the jury. Moreover, Blakely expressly holds that the statutory maximum sentence is the sentence based upon the jury's verdict. Blakely, 542 U.S. at 303 ("Our precedents make clear, however, the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose **solely on the basis of the facts reflected in the jury's verdict or admitted by the defendant.**") (emphasis in the original).

Here, prior to the decision in Blakely, Petitioner testified at his sentencing and admitted facts that were cited by the trial court to enhance his sentence. Thus, Petitioner's sentence enhancement was based upon facts **"admitted by the defendant"** that is permitted by Blakely. Thus, this claim lacks merit.

### 3. Closing argument

During closing argument, the prosecutor referred to the DNA material on the knife as the victim's skin: "Knife was used. Injuries on Laurinda Anderson tell us that. **The skin on the knife** tells us that, and that the Defendant acted intentionally, knowingly, or recklessly." (Docket Entry No. 14 at 10; Docket Entry No. 15-8, at 85) (emphasis added by Petitioner). The

prosecutor's rebuttal argument, included "So – but what we do know is that **Laurinda Anderson's skin is on that knife**; and we do know that her skin was broken. We do know that her DNA was there." Id.; Docket Entry No. 15-8 at 125 (emphasis added by Petitioner). The prosecutor is also cited in another reference to "the skin on the knife," and the testimony of Petitioner's testimony that the DNA material found on the knife was from her use of the knife: "So, for the Defendant to come in here and say, 'I have no idea' - - 'I had no idea that there was a knife there,' **and for his mother to come in and say**, '**Well, probably the reason there was skin on it is because I was cutting my foot with it,**' it's ridiculous." Id. at 11; Docket Entry No. 15-8 at 89 (emphasis added by Petitioner).

Prosecutorial misconduct must be so egregious as to deny petitioner a fundamentally fair trial before habeas corpus relief becomes available as a violation of the defendant's right to due process. Caldwell v. Mississippi, 472 U.S. 320, 335-36 (1985); Donnelly v. DeChristoforo, 416 U.S. 637, 643-45 (1974). Given the proof of the State's expert on the victim's DNA on Petitioner's knife, (Docket Entry No. 15-6 at 133), the Court concludes that the prosecutor's argument was supported by the facts and thus, this claim cannot be ground for habeas relief.

### 4. Defaulted Claim

Of these claims, Petitioner's claims for his trial counsel's "failure to object to jury instructions," and the related claim for alleged erroneous jury instruction were not presented to the state courts. Moreover, Petitioner's sentencing claim for the "potential for great bodily injury" enhancement, as a Blakely violation, was never raised to the state courts. Thus, the Court concludes that these claims are procedurally barred from habeas corpus relief for the lack of any showing of cause or prejudice. Coleman v. Thompson, 501 U.S. 722,752-753 ( 1991).

Petitioner's <u>Brady</u> claim is that the State did not provide DNA testing of the knife for non-blood matter and did not provide any DNA testing of the bedding and clothing of the victim in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 ( 1963). This claim was not presented to the state courts. The proof at trial was that the state expert conducted DNA testings of the victim, her panties and Petitioner's knife. (Docket Entry No. 15-6, at 124, 132-33). The vaginal swab revealed sperm with the victim's and petitioner's DNA, as did the victim's panties. <u>Id</u>. at 124-25. The Petitioner's knife also had the victim's DNA. <u>Id</u>. at 133. The expert also testified that a person's mere contact with a knife would be insufficient to leave human material for DNA testing. (Docket Entry No. 15-7 at 10). Given the Petitioner's admission of sex with the victim and the DNA test results, the Court cannot discern any evidentiary value in the testing of the bedding. Despite the availability of discovery for state post conviction proceedings and the pendency of this action, Petitioner has not made any factual showing to support this claim. Thus, the Court concludes that the <u>Brady</u> claim is procedurally defaulted and in any event lacks merit.

For these collective reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _29th_ day of November, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

HOMER A. MADDIN, III,        )
                                  )
      Petitioner,          )       NO.  3:09-00259
                                  )       JUDGE HAYNES
                                  )
                                  )
RICKY J. BELL, Warden,      )
                                  )
      Respondent.       )

## O R D E R

In accordance with the Memorandum filed herewith, Petitioner's amended petition for the writ of habeas corpus (Docket Entry No. 14) is **DENIED**. This action is **DISMISSED with prejudice**. Petitioner is **GRANTED** a Certificate of Appealability on all his non-defaulted claims.

This is the Final Order in this action.

It is so **ORDERED**.

**ENTERED** this the _24th_ day of November, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge